AUSAs: QAIS GHAFARY / JEFFREY C. COFFMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

24 MJ 4070

| UNITED STATES OF AMERICA | **SEALED COMPLAINT** |
|---|---|
| v. | Violations of 18 U.S.C. §§ 1512(b), 1001, 2 |
| MICHAEL O'FLAHERTY, | COUNTIES OF OFFENSE: |
| Defendant. | Dutchess, Westchester |

SOUTHERN DISTRICT OF NEW YORK, ss.:

SEAN SMYTH, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York, and charges as follows:

## COUNT ONE
### (Obstruction of an Official Proceeding)

1.      Between in or about September 2022 and October 2022, in the Southern District of New York and elsewhere, MICHAEL O'FLAHERTY, the defendant, and others known and unknown, willfully and knowingly did intimidate, threaten, and corruptly persuade another person, and attempted to do so, and engaged in misleading conduct toward another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a Federal offense, to wit, upon learning that a local law enforcement agency in Dutchess County ("Agency-1"), supported by the United States Drug Enforcement Administration ("DEA"), was investigating a narcotics trafficker ("Individual-1") for distributing fentanyl pills in Dutchess County (the "Fentanyl Investigation" or the "Investigation"), (i) O'FLAHERTY disclosed to Individual-1 the existence of the Fentanyl Investigation, and instructed and encouraged Individual-1 to destroy evidence of Individual-1's narcotics trafficking activities, (ii) while purportedly working cooperatively with the Fentanyl Investigation, concealed from members of the Fentanyl Investigation that O'FLAHERTY had disclosed the Investigation to Individual-1 and had instructed and encouraged Individual-1 to destroy evidence of Individual-1's narcotics trafficking activities; (iii) O'FLAHERTY concealed from members of the Fentanyl Investigation that O'FLAHERTY had propositioned Individual-1 during undocumented and undisclosed one-on-one meetings and communications with Individual-1 to assist O'FLAHERTY with transporting narcotics; (iv) O'FLAHERTY attempted to delay and prevent members of the Fentanyl Investigation from obtaining comprehensive telephonic records for Individual-1, which records revealed frequent and undisclosed contacts between O'FLAHERTY and Individual-1; and (v) O'FLAHERTY attempted to obtain sensitive law enforcement information from members of the Fentanyl Investigation, such as the identity of the Investigation's confidential source and the Investigation's potential use of a tracking device for Individual-1, all with the intent to hinder, delay, and prevent members of the Fentanyl Investigation from communicating to federal law enforcement authorities and federal judicial officers information relating to the commission or possible commission of federal offenses relating to narcotics distribution, obstruction of justice, and conspiracies to commit the same.

(Title 18, United States Code, Sections 1512(b)(3) and 2.)

## COUNT TWO
### (Obstruction of an Official Proceeding)

2. In or about September 2022, in the Southern District of New York and elsewhere, MICHAEL O'FLAHERTY, the defendant, and others known and unknown, willfully and knowingly did intimidate, threaten, and corruptly persuade another person, and attempted to do so, with intent to cause or induce that other person to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding, to wit, after O'FLAHERTY disclosed to Individual-1 the existence of the Fentanyl Investigation, O'FLAHERTY instructed and encouraged Individual-1 to destroy Individual-1's electronic devices containing evidence of Individual-1's narcotics trafficking activities.

(Title 18, United States Code, Sections 1512(b)(2)(B) and 2.)

## COUNT THREE
### (False Statements)

3. On or about December 22, 2022, in the Southern District of New York, MICHAEL O'FLAHERTY, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, O'FLAHERTY falsely denied to a special agent of the United States Attorney's Office for the Southern District of New York that (i) O'FLAHERTY had ever arranged to meet with Individual-1 without the presence of another member of law enforcement; (ii) O'FLAHERTY had ever met with Individual-1 without the presence of another member of law enforcement other than casual encounters in town during which O'FLAHERTY merely asked "how you doing?"; (iii) O'FLAHERTY had ever received any item of value from Individual-1; (iv) prior to June 7, 2022, O'FLAHERTY had ever explicitly or implicitly said anything to Individual-1 suggesting that O'FLAHERTY was involved in narcotics transportation; (v) prior to June 7, 2022, O'FLAHERTY had ever done anything to lead Individual-1 to believe that O'FLAHERTY might be open to transporting narcotics; (vi) O'FLAHERTY had ever implicitly or explicitly disclosed to Individual-1 or otherwise tipped off Individual-1 to any law enforcement investigation of Individual-1.

(Title 18, United States Code, Section 1001(a)(2).)

## COUNT FOUR
### (False Statements)

4. On or about December 22, 2022, in the Southern District of New York, MICHAEL O'FLAHERTY, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, O'FLAHERTY falsely stated to a special agent of the United States Attorney's Office for the Southern District of New York that (i) O'FLAHERTY had documented all substantive contacts with Individual-1; (ii) Individual-1 had requested a meeting that took place on June 7, 2022; (iii) Individual-1 had chosen the location of the meeting that took place on June 7, 2022; (iv) O'FLAHERTY had spontaneously fabricated a story during the June 7, 2022 meeting about having prior experience assisting with narcotics transportation in direct response to Individual-1's proposition of same to O'FLAHERTY; and (v) O'FLAHERTY had not sent Individual-1 photographs of cash prior to the June 7, 2022 meeting.

(Title 18, United States Code, Section 1001(a)(2).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.  I am a Special Agent with the United States Attorney's Office for the Southern District of New York and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

6.  In 2022, Agency-1 and the DEA investigated fentanyl pill distribution linked to multiple overdose deaths in Dutchess County. The Fentanyl Investigation identified Individual-1 and Individual-1's network of runners as a prolific source of fentanyl pills in the county. The Fentanyl Investigation also learned that Individual-1 had previously served as a confidential informant for the New York State Police ("NYSP") and had been supervised by MICHAEL O'FLAHERTY, the defendant, a police officer with the NYSP. During conversations with members of the Fentanyl Investigation, O'FLAHERTY expressed a willingness to assist the Investigation. But unbeknownst to the Fentanyl Investigation and O'FLAHERTY's own supervisors, O'FLAHERTY had maintained a personal relationship with Individual-1 both during and after Individual-1's tenure as an informant. O'FLAHERTY purported to assist the Fentanyl Investigation, but in fact O'FLAHERTY promptly told Individual-1 about the Fentanyl Investigation and encouraged Individual-1 to destroy evidence of Individual-1's narcotics trafficking. O'FLAHERTY also tried to dig for sensitive details about the Investigation, including the identity of the Investigation's confidential source within Individual-1's network. At the same time, O'FLAHERTY attempted to prevent the Fentanyl Investigation from discovering the nature and extent of O'FLAHERTY's interactions with Individual-1, including telephone calls, text messages, and one-on-one meetings that O'FLAHERTY had concealed from NYSP supervisors and colleagues. When federal investigators ultimately questioned O'FLAHERTY about the nature of his interactions with Individual-1, including O'FLAHERTY's disclosure of the Fentanyl Investigation, O'FLAHERTY lied to federal investigators.

### O'FLAHERTY Supervises Individual-1 as a Confidential Informant

7.  Based on information provided by the NYSP and information contained in NYSP records, my review of documents, and my interview of witnesses, I have learned the following in substance and in part:

    a.  At all times relevant to this Complaint, MICHAEL O'FLAHERTY, the defendant, was a law enforcement officer with the NYSP.

    b.  In or about 2019, O'FLAHERTY, then holding the position of Investigator in the NYSP's Troop K Violent Gang and Narcotics Enforcement Team ("K-VGNET"), participated in a narcotics investigation that ultimately led to the arrest of Individual-1. As a result of that investigation, Individual-1 was indicted in New York Supreme Court in Dutchess County on several state narcotics felonies (the "2019 Felony Charges").

3

c.      Subsequent to Individual-1's arrest on the 2019 Felony Charges, Individual-1 agreed to cooperate with the NYSP and to act as a confidential informant. Accordingly, on or about August 16, 2019, Individual-1 entered into a written cooperation agreement with the NYSP that contained, among other things, the standard condition that Individual-1 must not commit additional crimes.

d.      O'FLAHERTY was assigned as Individual-1's handler from the outset of Individual-1's cooperation and supervised Individual-1, in Individual-1's capacity as an informant, until O'FLAHERTY was directed to deactivate Individual-1 as a confidential informant on or about June 7, 2022. During the course of Individual-1's cooperation in 2019 and 2020, Individual-1 provided assistance on NYSP investigations into narcotics distribution in and around Dutchess County, New York.

e.      O'FLAHERTY remained in frequent contact with Individual-1 both before and after Individual-1's deactivation on June 7, 2022. O'FLAHERTY did not document a significant number of these contacts in violation of NYSP policy. Moreover, both before and after Individual-1's deactivation on June 7, 2022, O'FLAHERTY engaged in multiple, in-person meetings with Individual-1, without the presence of another member of law enforcement, also in violation of NYSP policy, and again without subsequently documenting the meetings in any NYSP case file related to Individual-1. Some of these undocumented, in-person, one-on-one meetings with Individual-1 are described below. Moreover, between approximately June 20, 2022, and October 18, 2022—three days before Individual-1 was arrested and subsequently charged with federal narcotics trafficking—O'FLAHERTY and Individual-1 engaged in more than 650 telephonic contacts, almost none of which were documented in any NYSP case file related to Individual-1.

f.      Both during the period that O'FLAHERTY supervised Individual-1 in Individual-1's capacity as a confidential informant and after Individual-1 was deactivated, O'FLAHERTY and Individual-1 communicated regularly about personal matters, including luxury cars, clothing, socializing with women, gambling, and financial problems. On one occasion when Individual-1 expressed an interest in starting a used car business and expressed hesitation about doing so under Individual-1's own name in light of Individual-1's criminal history, O'FLAHERTY advised Individual-1 to open the business under the name of a relative. On multiple occasions, O'FLAHERTY indicated to Individual-1 that O'FLAHERTY could not talk to Individual-1 on the telephone because O'FLAHERTY was in the presence of other law enforcement members.

g.      O'FLAHERTY and Individual-1 also frequently communicated about luxury collectible sneakers. On or about June 6, 2022, O'FLAHERTY texted Individual-1 a photograph of a particular luxury collectible sneaker ("Photograph-1"), and wrote to Individual-1, "Yo. Find these for me. Size 11." A true and accurate depiction of Photograph-1 is below. On the following day, Individual-1 found online and purchased the sneakers depicted in Photograph-1 for approximately $242 and subsequently gave them to O'FLAHERTY, who never compensated Individual-1 for the sneakers.

Photograph-1



## O'FLAHERTY Solicits Individual-1 to Assist in Drug Transport During Undisclosed Meeting on June 4, 2022

       8.     Based on my review of information contained in NYSP records, my interview of witnesses, including Individual-1, and my review of telephone records, including communications and location data, I have learned the following in substance and in part:

           a.     On or about June 2, 2022, a NYSP confidential informant ("Source-1") told MICHAEL O'FLAHERTY, the defendant, that Individual-1, who at that time was also a NYSP confidential informant, had resumed narcotics trafficking and had a source of supply in New York City. On or about June 3, 2022, O'FLAHERTY and another member of K-VGNET ("Officer-1") met with Source-1, who elaborated upon the information concerning Individual-1's source of supply and narcotics trafficking.

           b.     On or about the morning of Saturday, June 4, 2022, O'FLAHERTY called Individual-1 and asked to meet, and subsequently texted Individual-1 the address of a particular gym in Poughkeepsie ("Gym-1").

           c.     A few hours later, at approximately 12:00 p.m., O'FLAHERTY and Individual-1 met in the parking lot area of Gym-1 (the "June 4 Meeting"). O'FLAHERTY came to this meeting alone and was not accompanied by another member of law enforcement nor did he record or document the meeting in any NYSP file or record.

d.  During the June 4 Meeting, O'FLAHERTY and Individual-1 discussed O'FLAHERTY's financial problems, and O'FLAHERTY told Individual-1, in sum and substance, that O'FLAHERTY knew a New York City Police Department ("NYPD") officer ("Associate-1") who made money by transporting narcotics between locations in New Jersey and New York. O'FLAHERTY further told Individual-1, in sum and substance, that O'FLAHERTY, too, had made money by occasionally assisting Associate-1 with the transportation or by conducting the transportation when Associate-1 was unavailable. O'FLAHERTY asked Individual-1 if Individual-1 would be interested in making money by assisting O'FLAHERTY with the narcotics transports. Individual-1 did not accept O'FLAHERTY's proposal.

e.  Shortly after the June 4 Meeting, at approximately 1:55 p.m., O'FLAHERTY texted Individual-1: "Doing one tonight." Individual-1 responded, "You are crazy." O'FLAHERTY replied, "I'm going with him." Based on my participation in this investigation, I believe that O'FLAHERTY's statement "doing one tonight" was O'FLAHERTY's representation that he would be assisting in the transportation of narcotics for money that evening, and that O'FLAHERTY's statement, "I'm going with him," was O'FLAHERTY's representation that he would be conducting the transport alongside Associate-1.

f.  Later that evening, at approximately 8:37 p.m., O'FLAHERTY texted Individual-1 a photograph of a large quantity of cash ("Photograph-2"). A true and accurate representation of Photograph-2 is below.



Photograph-2



      g.    O'FLAHERTY and Individual-1 then engaged in the following text message exchange:

| | |
|---|---|
| Individual-1: | How much |
| O'FLAHERTY: | I got 1000 tonight. But I've been doing it for a few months. This is what I've saved. Ab[out] 5k. |
| Individual-1: | Really |
| O'FLAHERTY: | Easy. Only do it when he cant |

      h.    Based on my training and experience and my participation in this investigation, I believe that Photograph-2 is a photograph of cash that O'FLAHERTY represented to Individual-1 to be proceeds of O'FLAHERTY's assisting in the unlawful transportation of narcotics for another drug dealer. I further believe that O'FLAHERTY's statement, "I got 1000 tonight" was O'FLAHERTY's representation that he was compensated $1,000 for assisting in the transportation of narcotics that night, and that O'FLAHERTY's statement, "But I've been doing it for a few months. This is what I've saved. Ab[out] 5k" was O'FLAHERTY's representation that he had been assisting in the transportation of narcotics for multiple months, and had saved about $5,000 from the transports. I further believe that O'FLAHERTY's statement, "Only do it when he cant" was O'FLAHERTY's representation that he did the narcotics transports only when Associate-1 could not do so.

      i.    Two days later, on or about June 6, 2022, O'FLAHERTY asked Individual-1 to buy him a pair of luxury collectible sneakers, as described in Paragraph 7.g. above.

**O'FLAHERTY Stages Public Meeting with Individual-1 on June 7, 2022, and Obtains Supervisory Authorization for Undercover Operation Based on False Information**

    9.    Based on my review of documents, including NYSP records, my review of telephone records, including communications and location data, my interview of witnesses, and my participation in this investigation, I have learned the following in substance and in part:

      a.    On or about June 7, 2022, between approximately 11:07 a.m. and 11:25 a.m., O'FLAHERTY and Individual-1 engaged in the following text message exchange:

| | |
|---|---|
| O'FLAHERTY: | They need me to do something tomorrow. I wanna ask you something. |
| Individual-1: | What, ask me |
| O'FLAHERTY: | Call me when you can talk |
| Individual-1: | Is it important |
| O'FLAHERTY: | Kinda. It's not anything bout you |

      b.    Minutes later, Individual-1 attempted to call O'FLAHERTY, who did not answer. Individual-1 then texted O'FLAHERTY, "Yo, why you not picking up." O'FLAHERTY responded, "Got a guy with me. Give me 5."

      c.    O'FLAHERTY and Individual-1 thereafter spoke on the phone, and O'FLAHERTY told Individual-1, in sum and substance, that he wanted to meet Individual-1 in the parking lot of a particular grocery story in Poughkeepsie, New York ("Store-1").

    d.  At approximately 12:30 p.m., O'FLAHERTY and Individual-1 met in the Store-1 parking lot (the "June 7 Meeting"). O'FLAHERTY drove to the June 7 Meeting with Officer-1 and Individual-1 drove to the meeting with an associate. O'FLAHERTY and Individual-1 exited their respective vehicles and spoke out of earshot of Officer-1 and Individual-1's associate, each of whom remained in their vehicles.

    e.  During the June 7 Meeting, O'FLAHERTY and Individual-1 discussed, among other things and in sum and substance, O'FLAHERTY's financial problems and O'FLAHERTY's financial motivation for assisting in the transportation of narcotics. O'FLAHERTY also followed up on his June 4 Meeting proposal to Individual-1 and encouraged Individual-1 to join O'FLAHERTY in transporting narcotics in the future, including because Individual-1 would be an asset due to Individual-1's facility with "drug lingo." Individual-1 continued to express hesitation about accepting O'FLAHERTY's proposal; at one point, Individual-1 laughed and retorted that, rather than Individual-1 assisting O'FLAHERTY with O'FLAHERTY's narcotics transport, O'FLAHERTY should instead assist Individual-1 with transporting cocaine for Individual-1.

    f.  After departing the June 7 Meeting, O'FLAHERTY notified his immediate supervisor ("NYSP Supervisor-1") that O'FLAHERTY had just left a meeting with Individual-1 and that O'FLAHERTY needed to meet with NYSP Supervisor-1 urgently.

    g.  O'FLAHERTY, Officer-1, and NYSP Supervisor-1 met at a location nearby Store-1. O'FLAHERTY told NYSP Supervisor-1, in sum and substance, that Individual-1 had requested the June 7 Meeting and that during the June 7 Meeting, Individual-1 had propositioned O'FLAHERTY to help Individual-1 with the transportation of narcotics. O'FLAHERTY further stated, in sum and substance, that while O'FLAHERTY was surprised by Individual-1's proposal, O'FLAHERTY had spontaneously decided during the June 7 Meeting conversation with Individual-1 to go along with Individual-1's proposal and to pretend to be a corrupt law enforcement officer, including by fabricating a story that O'FLAHERTY had prior experience assisting Associate-1 with narcotics transports between New Jersey and New York. O'FLAHERTY further stated, in sum and substance, that he had spontaneously fabricated this story during the June 7 Meeting in order to seize upon the opportunity presented when Individual-1 propositioned O'FLAHERTY and thereby to further an investigation into Individual-1's narcotics trafficking and source of supply.

    h.  On the basis of this false information, NYSP Supervisor-1 told O'FLAHERTY that he would seek supervisory authorization for O'FLAHERTY to pursue an undercover operation whereby O'FLAHERTY could serve as an undercover officer holding himself out to Individual-1 to be a corrupt police officer willing to assist Individual-1 in the transportation of narcotics (the "Undercover Operation"). NYSP Supervisor-1 also directed O'FLAHERTY to deactivate Individual-1 as a NYSP confidential informant, which O'FLAHERTY did the same day.

    i.  Thereafter, NYSP Supervisor-1 reported to the supervisor of K-VGNET ("NYSP Group Supervisor-1"), in sum and substance, what O'FLAHERTY had conveyed to NYSP Supervisor-1 regarding the June 7 Meeting, namely, that Individual-1 had requested the June 7 Meeting, had spontaneously propositioned O'FLAHERTY during the June 7 Meeting to assist in narcotics transportation, and that O'FLAHERTY had spontaneously pretended during the June 7 Meeting to be a corrupt police officer with prior experience transporting narcotics. On

the basis of this false information, NYSP Supervisor-1 requested and received from NYSP Group Supervisor-1 temporary authorization to pursue the Undercover Operation.

j.      Contrary to what O'FLAHERTY told NYSP Supervisor-1, which was the basis for NYSP Group Supervisor-1's temporary authorization of the Undercover Operation, O'FLAHERTY had solicited Individual-1's assistance in transporting drugs during the undisclosed June 4 Meeting with Individual-1, continued to pursue it during undisclosed communications with Individual-1, and then staged the public June 7 Meeting. O'FLAHERTY did not spontaneously decide during the June 7 Meeting to hold himself out to be a corrupt police officer in response to Individual-1's proposition; rather, O'FLAHERTY had already asked Individual-1 to assist him with transporting narcotics prior to and through the June 7 Meeting.

k.      In July and August 2022, O'FLAHERTY continued to solicit Individual-1's assistance in transporting narcotics from New Jersey to New York City. For example, on or about July 1, 2022, O'FLAHERTY texted Individual-1 a photograph of a large quantity of cash ("Photograph-3"). A true and accurate representation of Photograph-3 is below.

Photograph-3



l.      O'FLAHERTY and Individual-1 then engaged in the following text message exchange:

    O'FLAHERTY:   So fat aint bad
    Individual-1:     I need some of that
    O'FLAHERTY:   Said tomorrow 2k
    Individual-1:     No I'm good

m.      Based on my training and experience and my participation in this investigation, I believe that Photograph-3 is a photograph of cash that O'FLAHERTY represented to Individual-1 to be proceeds of O'FLAHERTY's assisting in the transportation of narcotics. I further believe that O'FLAHERTY's statement, "So fat aint bad" is O'FLAHERTY's

representation that his participation in transporting narcotics was profitable, and that O'FLAHERTY's statement, "Said tomorrow 2k," is O'FLAHERTY's representation that he and Individual-1 could earn $2,000 for a narcotics transportation job on the following day.

          n.      Again on or about August 9, 2022, O'FLAHERTY and Individual-1 engaged in the following text message exchange:

        O'FLAHERTY:   Come with me tomorrow, NJ to NYC
        Individual-1:     No, plans
        O'FLAHERTY:   I'll split with you
        Individual-1:     No when I get my license
        O'FLAHERTY:   I haven't done it in a while

          o.      Unlike O'FLAHERTY's continued solicitation of Individual-1 to assist O'FLAHERTY with narcotics transportation from New Jersey to New York City, as O'FLAHERTY had outlined during the undisclosed June 4 Meeting, at no point between in or about June 2022 through September 2022 did O'FLAHERTY text with Individual-1 about O'FLAHERTY assisting with Individual-1's cocaine trafficking, which was the purported basis from the June 7 Meeting that O'FLAHERTY had used to obtain authorization for the Undercover Operation.

          p.      By September 2022, O'FLAHERTY told other law enforcement members, including NYSP Supervisor-1, that the Undercover Operation had not been successful and that O'FLAHERTY would await the release from prison of Source-1 in order to resume the narcotics investigation of Individual-1 and Individual-1's source of supply.

**O'FLAHERTY Discloses Existence of the Fentanyl Investigation to Individual-1**

        10.      Based on my review of documents, my review of telephone records, including communications and location data, my interview of witnesses, and my participation in this investigation, I have learned the following in substance and in part:

          a.      From in or about July 2022 through in or about October 2022, Agency-1, supported by the DEA, investigated the distribution of fentanyl pills in and around Poughkeepsie, New York, by particular street-level dealers, including in connection with fentanyl pill overdose deaths in Dutchess County, *i.e.*, the Fentanyl Investigation. As part of the Fentanyl Investigation, Agency-1 developed a confidential informant who had been distributing fentanyl pills on behalf of Individual-1.

          b.      On or about September 8, 2022, an Agency-1 supervisor ("Agency Supervisor-1") initiated a law enforcement deconfliction inquiry regarding Individual-1, which indexed Individual-1 as a target of NYSP K-VGNET and identified MICHAEL O'FLAHERTY, the defendant, as the NYSP point of contact. The deconfliction inquiry also automatically resulted in email notifications to both O'FLAHERTY and Agency Supervisor-1 about the initiation and result of the inquiry (the "Deconfliction Alert").

          c.      Shortly after the Deconfliction Alert, on or about September 8, 2022, O'FLAHERTY and another member of Agency-1 ("Agent-1") had a telephone discussion regarding Individual-1 and the Fentanyl Investigation (the "September 8 Agency-1 Telephone Call"). Agency Supervisor-1 listened in on the September 8 Agency-1 Telephone Call, but did not participate in the discussion. O'FLAHERTY told Agent-1, in sum and substance, that

Individual-1 was a recently deactivated confidential informant that O'FLAHERTY had supervised; that O'FLAHERTY was investigating Individual-1 for trafficking narcotics from a source of supply in New York City to Dutchess County; that O'FLAHERTY was working with a law enforcement "group" in New York City as part of his investigation; that O'FLAHERTY's investigation of Individual-1 had stalled and that O'FLAHERTY was awaiting the release of Source-1 from prison in order to resume the investigation of Individual-1; and that Individual-1 had spontaneously propositioned O'FLAHERTY to assist Individual-1 in the transportation of narcotics.

    d. During the September 8 Agency-1 Telephone Call, O'FLAHERTY asked Agent-1 to provide him with advance notice of any controlled purchases of narcotics from Individual-1 as part of the Fentanyl Investigation, which Agent-1 agreed to do. O'FLAHERTY also asked Agent-1 for the identity of the confidential informant that the Fentanyl Investigation intended to use to engage in the controlled purchase of narcotics from Individual-1. Agent-1 regarded this request as extremely unusual and declined to provide the confidential informant's identity to O'FLAHERTY.

    e. On or about September 11, 2022, within days of learning about the existence of the Fentanyl Investigation of Individual-1 for narcotics trafficking, O'FLAHERTY told Individual-1 to meet him in the vicinity of Gym-1. O'FLAHERTY—who was not accompanied by another law enforcement officer—and Individual-1 thereafter met inside of O'FLAHERTY's vehicle, which was parked in the parking lot area of Gym-1 (the "September Gym-1 Meeting"). O'FLAHERTY then engaged in the following communication with Individual-1 in sum and substance. O'FLAHERTY did not verbalize his messages. Instead, in each instance, O'FLAHERTY typed a message on his cellphone and silently displayed the message to Individual-1, before then deleting the message and writing a new one; in the meantime, Individual-1 in each instance verbally responded in a low volume to O'FLAHERTY's displayed message.

| | |
|---|---|
| O'FLAHERTY: | They're on to you |
| Individual-1: | What |
| O'FLAHERTY: | Pills |
| O'FLAHERTY: | Get rid of your phones |
| Individual-1: | Which phones |
| O'FLAHERTY: | Both of them |

    f. O'FLAHERTY did not record, document, or otherwise disclose the September Gym-1 Meeting. Immediately following the September Gym-1 Meeting, Individual-1 told runners who distributed fentanyl pills for Individual-1, in sum and substance, that Individual-1 had been informed by a "cop friend" that Individual-1 was being investigated and under surveillance, and that Individual-1's drug runners should be extra cautious, including in how they sold fentanyl pills to their customers and in the words that they used when speaking on the phone to Individual-1, such as how the drug runners referred to Individual-1, all in an effort to better evade any law enforcement detection. I know based on my involvement in this investigation that the phones used by Individual-1 and his coconspirators contained evidence of drug trafficking and of Individual-1's communications with O'FLAHERTY.

    g. Approximately one week after the September Gym-1 Meeting, O'FLAHERTY—unaccompanied by another law enforcement officer—and Individual-1 met at

a particular location in Poughkeepsie, New York ("September Poughkeepsie-1 Meeting"), and O'FLAHERTY asked Individual-1 whether Individual-1 had yet discarded Individual-1's phones, as O'FLAHERTY had advised during the September Gym-1 Meeting. Individual-1 said no, and O'FLAHERTY responded by shaking his head in a manner expressing displeasure. O'FLAHERTY did not record, document, or otherwise disclose the September Poughkeepsie-1 Meeting.

11. Based on my review of documents, my review of telephone records, and my interview of witnesses, I have learned the following in substance and in part:

a. During the September 8 Agency-1 Telephone Call, Agent-1 asked MICHAEL O'FLAHERTY, the defendant, for the primary telephone number used by Individual-1. O'FLAHERTY inquired, in sum and substance, how Agent-1 intended to use Individual-1's telephone number in connection with the Fentanyl Investigation, and Agent-1 conveyed that Agency-1 intended to cross-reference Individual-1's telephone number against other telephone numbers known to Agency-1 as potentially linked to Individual-1's drug runners. O'FLAHERTY, in sum and substance, committed to providing Agent-1 with Individual-1's telephone number.

b. After the September 8 Agency-1 Telephone Call, O'FLAHERTY did not promptly provide Agent-1 with Individual-1's telephone number. Accordingly, approximately one week later, on or about September 14, 2024, Agent-1 followed up with O'FLAHERTY, asking again for Individual-1's telephone number. O'FLAHERTY responded that he had "forgot[ten]," and this time provided Individual-1's telephone number. O'FLAHERTY and Agent-1 thereafter engaged in the following exchange:

| | |
|---|---|
| O'FLAHERTY: | Lemme know if u [sic] shows up |
| Agent-1: | Ok. Let you know what? |
| O'FLAHERTY: | If the number comes up on ur list |
| O'FLAHERTY: | Ur running against ur targets right? |
| Agent-1: | Ok |
| O'FLAHERTY: | Ur checking it against ur targets right? |
| Agent-1: | Yes |
| O'FLAHERTY: | [C]ool. Lemme know so I can keep my [sic] group I'm working with in nyc updated. Thanks |
| Agent-1: | Sure thing |

c. Approximately two hours later, O'FLAHERTY texted Agent-1, "Any luck[?]", to which Agent-1 responded, "Haven't got to it yet[,] I'll let you know." The next morning, O'FLAHERTY texted Agent-1 again, "Anything with that number[?]" Agent-1 did not immediately respond, at which point O'FLAHERTY texted Agency Supervisor-1, "Hey. Any luck with [Individual-1's] number I [g]ave [Agent-1]?" Agency Supervisor-1 responded, "We are still waiting on subpoenas I believe." O'FLAHERTY responded, "Ah I thought you had the[m]. Ok." Agency Supervisor-1 replied, "The DEA agent assigned to us gets them pretty quick should be next week if he does not have them." O'FLAHERTY responded, "Ok." A few hours later and into the next morning, O'FLAHERTY and Agent-1 then engaged in the following exchange:

| | |
|---|---|
| Agent-1: | Haven't even sent the subpoena yet. Swamped with cases |
| O'FLAHERTY: | U guys aren't gonna subpoena [Individual-1's] number r u? |
| Agent-1: | Yes. Why what's up |
| O'FLAHERTY: | We r doing it. I don't wanna do double work. Our group in the city had been working it all up |
| Agent-1: | I'll text you a little later, on a take down … We already sent for it so I can get you a copy when it comes in. Not a big deal. |

      d.    A few days later, O'FLAHERTY asked Agent-1, "Anything with the subpoena[?]," to which Agent-1 responded, "Still working on it. I'll let you know." O'FLAHERTY replied with a "thumbs-up" emoji.

      e.    At no point during the above-referenced telephone conversations and text message communications with members of the Fentanyl Investigation did O'FLAHERTY disclose that he had been in frequent telephonic with Individual-1 in or about June 2022 through September 2022. O'FLAHERTY likewise concealed from members of the Fentanyl Investigation that he had disclosed the existence of that Investigation to Individual-1 and had instructed and encouraged Individual-1 to destroy evidence of Individual-1's narcotics trafficking.

      f.    The Fentanyl Investigation subsequently obtained via subpoena the records associated with Individual-1's telephone number. The records showed that during the approximately three-month period between June 20, 2022, and September 16, 2022, Individual-1 and O'FLAHERTY had engaged in more than 600 telephonic contacts with one another, approximately 40% of which were initiated by O'FLAHERTY and approximately 60% of which were initiated by Individual-1. During the approximately one-week period between September 8, 2022, and September 16, 2022, alone, *i.e.,* in the days immediately following the Deconfliction Alert and the September 8 Agency-1 Telephone Call, O'FLAHERTY and Individual-1 engaged in more than 50 telephonic contacts with one another.

      g.    O'FLAHERTY did not again inquire from Agency Supervisor-1 or Agent-1 about the results of the Individual-1 telephone records subpoena for approximately one-month. On or about October 19, 2022, O'FLAHERTY and Agency Supervisor-1 engaged in a telephone conversation, following certain events detailed in Paragraph 12 below, during which O'FLAHERTY asked about the results of the Fentanyl Investigation's subpoena of Individual-1's telephone records. O'FLAHERTY asked whether O'FLAHERTY's telephone number had shown up on Individual-1's telephone records, and disclosed—for the first time—to a member of the Fentanyl Investigation that Individual-1 "calls [O'FLAHERTY] every day."

      h.    After the Fentanyl Investigation identified Individual-1's probable source of fentanyl pill supply in New York City ("Supplier-1"), Agency-1 initiated a law enforcement deconfliction inquiry of Supplier-1, which revealed that that Supplier-1 had been indexed by a member of the New York Drug Enforcement Task Force ("DETF"), a New York City-based, DEA-led drug task force consisting of member of the DEA, NYPD, and NYSP, among others. A member of the Fentanyl Investigation contacted a point of contact on the DETF, who stated in sum and substance that DETF's investigation of Supplier-1 did not have any known nexus to law

enforcement efforts in Dutchess County nor was he aware of the task force working with any member of the NYSP based in Dutchess County.

12. Based on my review of documents and phone records, and my interview of witnesses, I have learned the following in substance and in part:

 a. On or about October 18, 2022, a law enforcement officer working in coordination with the Fentanyl Investigation initiated a traffic stop of Individual-1, identified Individual-1 by name, and subsequently released Individual-1 without charge. Individual-1 thereafter called O'FLAHERTY upset about the traffic stop and told O'FLAHERTY to look into how law enforcement had identified Individual-1's location, including whether law enforcement had tracked Individual-1 via a GPS tracker on Individual-1's vehicle.

 b. O'FLAHERTY then communicated with Agency Supervisor-1, asking in sum and substance, whether Agency-1 had placed a GPS tracker on Individual-1's vehicle because Individual-1 had found a GPS on his vehicle and discarded it following Individual-1's traffic stop. Agency Supervisor-1 told O'FLAHERTY, in sum and substance, that Agency-1 did not use a GPS tracker for Individual-1, that Individual-1 remained an active target of the Fentanyl Investigation, and that O'FLAHERTY should cease all communications with Individual-1.

 c. On or about October 21, 2022, members of the Fentanyl Investigation arrested Individual-1 for narcotics distribution following a controlled purchase of fentanyl pills from Individual-1's runner, a law enforcement surveillance operation, and a search of Individual-1's residence pursuant to a judicially authorized warrant, where fentanyl pills were recovered. O'FLAHERTY and Agency Supervisor-1 subsequently spoke by telephone, during which call O'FLAHERTY expressed frustration about the Agency-1 arrest of Individual-1, and asked Agency Supervisor-1 to release Individual-1 so that O'FLAHERTY could continue the NYSP investigation into Individual-1's New York City source of supply. Agency Supervisor-1 declined to release Individual-1, and invited O'FLAHERTY to participate in the post-arrest interview, but O'FLAHERTY declined. Agency-1 and DEA agents jointly conducted the post-arrest interview of Individual-1, who was ultimately charged with federal narcotics offenses for distributing tens of thousands of fentanyl pills over a multiyear period.

### **O'FLAHERTY Lies to Federal Investigators**

13. Based on my participation in this investigation, including my participation in an interview of MICHAEL O'FLAHERTY, the defendant, I know that O'FLAHERTY sat for a voluntary interview with a Special Agent and Assistant United States Attorneys at the U.S. Attorney's Office for the Southern District of New York (the "USAO Interview"). The USAO Interview took place on December 22, 2022, at the White Plains office of the U.S. Attorney's Office. O'FLAHERTY was represented by counsel during the USAO Interview. At the outset of the USAO Interview, O'FLAHERTY was told that the interview was voluntary and in connection with a federal grand jury investigation. O'FLAHERTY was further told that his statements would not be protected by any immunity and could be used against him. O'FLAHERTY was further told that he could be prosecuted for making false statements during the interview.

14. Based on my participation in this investigation, including my review of documents and interviews of witnesses, and my participation in the USAO Interview of MICHAEL O'FLAHERTY, the defendant, I know that during the USAO Interview:

a. O'FLAHERTY was specifically asked whether he ever arranged to meet with Individual-1 without the presence of another member of law enforcement. O'FLAHERTY falsely responded that he had never done so. In fact, O'FLAHERTY had arranged to meet with Individual-1 without the presence of another member of law enforcement on multiple occasions, both while Individual-1 served as a confidential informant and after Individual-1 was deactivated, including the June 4 Meeting, the September Gym-1 Meeting, and the September Poughkeepsie-1 Meeting.

b. O'FLAHERTY was specifically asked whether he ever, in fact, met with Individual-1 without the presence of another member of law enforcement. O'FLAHERTY falsely responded that he had never done so, other than casual encounters in town during which he would merely ask "how you doing?", because participating in such a meeting would violate NYSP policy. In fact, O'FLAHERTY had intentionally met with Individual-1 without the presence of another member of law enforcement on multiple non-casual occasions, both while Individual-1 served as a confidential informant and after Individual-1 was deactivated, including the June 4 Meeting, the September Gym-1 Meeting, and the September Poughkeepsie-1 Meeting, during which they discussed narcotics activity.

c. O'FLAHERTY was specifically asked whether he documented all substantive contacts with Individual-1 consistent with NYSP policy. O'FLAHERTY falsely stated that he had done so. In fact, O'FLAHERTY had not documented numerous substantive telephone calls, text message communications, and meetings with Individual-1, in violation of NYSP policy.

d. O'FLAHERTY was specifically asked whether he had ever received anything of value from Individual-1. O'FLAHERTY falsely stated that he never received anything of value from Individual-1, including because that would have been against NYSP policy. In fact, O'FLAHERTY had received a gift of luxury collectible sneakers worth more than $200 from Individual-1.

e. O'FLAHERTY falsely stated that Individual-1 requested the June 7 Meeting and chose the location of the meeting. In fact, O'FLAHERTY had proposed the June 7 Meeting to Individual-1 and selected its location.

f. O'FLAHERTY falsely stated that prior to the June 7 Meeting, O'FLAHERTY had never explicitly or implicitly said anything to Individual-1 to give the impression that O'FLAHERTY was involved in narcotics transportation. In fact, O'FLAHERTY told Individual-1 during the undisclosed June 4 Meeting that O'FLAHERTY had prior experience transporting narcotics.

g. O'FLAHERTY falsely stated that he spontaneously fabricated a story during the June 7 Meeting about having prior experience assisting Associate-1 with narcotics transportation in direct response to Individual-1's proposition of O'FLAHERTY. In fact, O'FLAHERTY's conveyance to Individual-1 that he had prior experience transporting narcotics was not in response to a proposition by Individual-1 during the June 7 Meeting.

h. O'FLAHERTY was specifically asked whether he had done anything prior to the June 7 Meeting that would have led Individual-1 to believe O'FLAHERTY might be open to transporting narcotics. O'FLAHERTY falsely stated that he had not, and that he was surprised during the June 7 Meeting when Individual-1 asked him. In fact, O'FLAHERTY had told Individual-1 that O'FLAHERTY periodically transported narcotics, and had solicited Individual-

1 to assist O'FLAHERTY in transporting narcotics, at least as early as the undisclosed June 4 Meeting.

        i. O'FLAHERTY falsely stated that, soon after the June 7 Meeting and the authorization of the Undercover Operation, O'FLAHERTY sent Individual-1 a photograph of thousands of dollars of cash in order to further the Undercover Operation, and that he had not sent Individual-1 photographs of cash prior to the June 7 Meeting. In fact, O'FLAHERTY sent Individual-1 a photograph of thousands of dollars of cash prior to the staged June 7 Meeting.

        j. O'FLAHERTY was specifically asked whether he ever implicitly or explicitly disclosed to Individual-1 the existence of a law enforcement investigation of Individual-1 for narcotics trafficking. O'FLAHERTY falsely denied having done so. In fact, soon after learning about the existence of the Fentanyl Investigation of Individual-1, O'FLAHERTY implicitly and explicitly communicated to Individual-1 the existence of a law enforcement investigation of Individual-1's narcotics trafficking.

        WHEREFORE, I respectfully request that a warrant be issued for the arrest of MICHAEL O'FLAHERTY, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
SEAN SMYTH
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to me this 20th day of November, 2024.

_____
THE HONORABLE VICTORIA REZNIK
United States Magistrate Judge
Southern District of New York

16